**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ODYSSEY WASTE SERVICES, LLC,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BFI WASTE SYSTEMS OF NORTH** | : | |
| **AMERICA, INC., TAC TRANSPORT,** | : | |
| **INC., and SAMUEL RINGGOLD,** | : | |
| **Defendants** | : | **NO. 05-cv-1929** |

## MEMORANDUM AND ORDER

PRATTER, DISTRICT JUDGE                                    FEBRUARY 27, 2007

Odyssey Waste Services, LLC ("Odyssey") has sued BFI Waste Systems of North America, Inc. ("BFI") for breach of contract and intentional interference with business and economic relations, and has sued Samuel Ringgold and TAC Transport, Inc. ("TAC") for intentional interference with economic and business relations. BFI and Mr. Ringgold move for summary judgment on Counts II and III of the Complaint, respectively, and TAC moves for summary judgment on Count IV. For its part, Odyssey seeks summary judgment on Count I. BFI and Mr. Ringgold also have filed a "Motion to Exclude Odyssey Valuation Opinions and Any Testimony of Plaintiff's Expert With Respect Thereto," which Odyssey opposes. For the reasons discussed more fully below, the Court grants BFI's, Mr. Ringgold's and TAC's motions as to Counts II, III and IV, and denies Odyssey's Motion for Summary Judgment as to Count I, as well as BFI's and Mr. Ringgold's Motion to Exclude.

BACKGROUND

The uncontested facts disclose the following context for this dispute.  Odyssey and TAC are certified minority-owned waste hauling companies.  At various times these two firms were hired by BFI, a corporation that operates waste transfer stations and disposal sites.  In 1998, BFI entered into a Waste Disposal Agreement with the City of Philadelphia ("City Contract"), pursuant to which BFI was obligated to receive, transport and dispose of 65% of the City's municipal solid waste in exchange for annual compensation of approximately $27 million.  The City Contract had a term of four years, commencing on July 1, 1998, with an option for the City to extend the term for three one-year renewal periods.  The City Contract was indeed renewed for the three one-year renewal periods, making its ultimate expiration date June 30, 2005.  Pursuant to the City Contract, municipal waste disposal trucks delivered waste to two BFI transfer stations, the TRC Station and the 58th Street Station.  From there, BFI used third-party haulers to transport the waste to BFI's Conestoga landfill or to an incinerator in the city of Chester.

The City Contract required BFI to include participation by minority-owned subcontractors ("Minority Participation Program").  In order to fulfill this obligation, BFI entered into a Waste Transportation Agreement (the "WTA") with Odyssey on June 17, 1998, by which Odyssey was to transport municipal and commercial waste to BFI's Conestoga landfill.  The WTA provided that Odyssey would haul all of the municipal and commercial waste delivered to BFI's TRC and 58th Street transfer stations, with the exception of construction and demolition waste.  The initial term of the WTA was four years, with three one-year options to renew.  Renewal of the City Contract automatically extended the term of the WTA, making it coterminous with the City Contract.  Accordingly, the WTA, like the City Contract, had the ultimate expiration date of June

2

30, 2005.

BFI employed Mr. Ringgold from 1997 to September 1, 1999, when he entered into a Consulting Agreement with BFI.  As a consultant, Mr. Ringgold's primary responsibilities included responsibility for BFI's compliance with the Minority Participation Program, which required Mr. Ringgold to solicit minority and women-owned firms.  BFI and Mr. Ringgold also intended for Mr. Ringgold to help BFI secure the extension or rebid of the City Contract.  In August 2004, Mr. Ringgold became a full-time employee of Allied Waste Industries, Inc. ("Allied"), BFI's corporate parent.  Mr. Ringgold's responsibilities on behalf of BFI with respect to the City and the Minority Participation Program remained the same.  He was also directed to help BFI secure a new waste disposal contract with the City, to begin July 1, 2005.

In 2003, Donald Neukam, then BFI's Regional Vice President of its Capital Region, instructed Mr. Ringgold to look for other potential minority haulers for the Philadelphia market. In 2004, Mr. Ringgold and Mr. Neukam identified TAC as a potential candidate to replace Odyssey for the subcontract under the new contract with City.  Negotiations then began with TAC.

In December 2004, the City sent BFI a notice of default under the City Contract due to "excessive delays" and the accumulation of trash at the transfer stations.  BFI had previously hired third-party haulers in addition to Odyssey, and at least by the end of 2004, it appeared that TAC would likely begin work for BFI before the expiration of the WTA.  BFI sought approval from the City's Minority Business Enterprise Council ("MBEC") to replace Odyssey with TAC and Danella Transport, Inc., a female-owned firm.  On March 24, 2005, the MBEC approved BFI's request, and by April 2005, BFI had negotiated and entered into substitute contracts with

3

TAC and Danella, each with anticipated commencement dates in April 2005.

On March 29, 2005, Odyssey brought this action in the Court of Common Pleas of Philadelphia County against BFI, Mr. Ringold and TAC.  The Defendants properly removed the case to this Court.[1]  BFI and Mr. Ringold filed an Answer with affirmative defenses, along with a single-count counterclaim against Odyssey alleging breach of contract (Docket No. 6).  TAC filed a Motion to Dismiss (Docket No. 5), which the Court subsequently denied in its Order of November 18, 2005.

**LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at

---

[1] Before commencing the instant suit, Odyssey filed a petition for relief under Chapter 11 of Title 11 of United States Code, 11 U.S.C. §101-1330, in the United States Bankruptcy Court for the Eastern District of Pennsylvania.  The bankruptcy suit, Case No. 05-13719, has subsequently been dismissed.

trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case," id. at 325, or offer affirmative evidence which demonstrates that the plaintiff cannot prove his case, Lawrence v. Nat'l Westminister Bank N.J., 98 F.3d 61, 69 (3d Cir. 1996).  After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The evidence provided by the nonmovant is to be believed, and the court must draw all reasonable and justifiable inferences in the nonmovant's favor.  Anderson, 477 U.S. at 255. However, a nonmovant plaintiff cannot defeat a motion for summary judgment by merely restating the allegations of the complaint, but instead must "point to concrete evidence in the record that supports each and every essential element in his case." Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995) (citing Celotex, 477 U.S. at 322).  Thus, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions to survive a summary judgment motion.  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex, 477 U.S. at 325).

**DISCUSSION**

**A.     Odyssey's Motion for Summary Judgment as to Count I: Breach of Contract**

Odyssey moves for summary judgment as to Count I, its breach of contract claim against BFI.  In evaluating this Motion, the Court must view the facts in the light most favorable to BFI and draw all inferences in its favor.  Todish v. Cigna Corp., 206 F.3d 303, 305 (3d Cir. 2000).

Pursuant to Pennsylvania law, the elements required to establish a breach of contract claim are (1) the existence of a contract, including its essential terms; (2) a breach of a duty

5

imposed by the contract; and (3) resulting damages.  Ware v. Rodale Press, Inc., 322 F.3d 218,

225 (3d Cir. 2003); J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc., 792 A.2d 1269, 1272 (Pa.

Super. 2002).

It is undisputed that Odyssey and BFI entered into a contract that was valid and binding

on both parties.  The basic terms of the contract are also undisputed.[2]

---

[2] The WTA provides in relevant part:

1.01.  Loading and Transportation:  Odyssey agrees that it will accept and BFI agrees that it will deliver to Odyssey pursuant to this Agreement, municipal and commercial solid waste material (the "Waste Material"). BFI will load all Waste Material into Odyssey's trailers at BFI's transfer stations at TRC and the Transcyclery (the "Transfer Stations").

1.02.  Disposal Sites: All Waste Material will be transported by Odyssey to BFI's disposal sites at the Chester, Pennsylvania incinerator and the Conestoga Landfill in Morgantown, Pennsylvania (the "Disposal Sites").

1.03.  Access to Transfer Stations and Disposal Sites:  BFI agrees that Odyssey will have priority over other operators using the Transfer Stations for loading Waste Material and that Odyssey will have priority over other operators using the Disposal Sites as set forth in the Operations Manual.

1.04.  Tonnage Guarantee:  During the term of this Agreement, BFI agrees to deliver to Odyssey, for transport under this Agreement, all Waste Material delivered to BFI's Transfer Stations pursuant to the Solid Waste Disposal Agreement (the "City Contract") executed between the City of Philadelphia and BFI dated June __, [sic] 1998.  (Except as otherwise provided, the terms used herein and not defined herein shall have the meanings given to them in the City Contract). BFI guarantees to deliver to Odyssey the following "Guaranteed Quantity" of Waste Material: (a) not less than the [sic] one hundred (100%) of all of the Waste Material delivered to the Transfer Stations under the City Contract except for construction and demolition waste; and (b) all Waste Material generated from commercial sources and available at the Transfer Stations except for construction and demolition waste.
        . . .

8.01.  Events of Default:  The following events shall

6

Essentially, BFI was obligated to make available to Odyssey all of the "municipal and commercial waste" received at the Transfer Stations and give Odyssey "priority" in loading and disposing of such material.  (WTA §§ 1.01, 1.03, 1.04.)  For its part, Odyssey was obligated to "accept" and transport to the specified disposal sites all of such waste material, as well as to supply the "labor and equipment," including at least 46 trailers and the tractors to pull them.  (Id. at §§ 1.01, 1.02, 3.02.)  Both parties agreed to comply "with all applicable federal, state and local statutes, ordinances, rules and regulations in the performance of this Agreement."  (Id. at § 20.)

Odyssey moves for summary judgment on the grounds that (1) it is undisputed that BFI repeatedly hired third-party haulers between 2002 and 2003, and (2) it is undisputed that BFI did not provide Odyssey with priority loading status at the Transfer Stations.  Odyssey contends that this conduct constitutes a breach of the WTA because BFI violated the priority and exclusivity provisions (§§ 1.03 and 1.04, respectively).  BFI does not dispute that it used third-party haulers

---

constitute an "Event of Default" hereunder: (A) Failure of BFI to (i) provide the Guaranteed Quantity as set forth in Section One; or (ii) pay Odyssey an amount equal to the Fees due for the Guaranteed Quantity as set forth in Section One . . . (D) If Odyssey fails to transport the Guaranteed Quantity as set forth in Section One and fails to reimburse BFI for costs incurred by BFI in excess of the Fees that would have been due Odyssey if Odyssey had not failed to transport the Guaranteed Quantity . . . .

8.02.  Termination:  Upon the occurrence of an Event of Default, the aggrieved party shall have the right to terminate this Agreement upon forty-five (45) days written notice to the other party (the "Notice"), in addition to all other rights and remedies of the aggrieved party existing at law or in equity. However, if the defaulting party has cured the Event of the Default within forty-five (45) days of the date of the Notice, this Agreement shall not terminate but shall remain in full force and effect.

in addition to Odyssey during the period from January 1, 2003 until the expiration of the WTA, or that Odyssey did not receive priority at the transfer stations over those other third-party haulers.  Likewise, BFI has not presented evidence sufficient to raise a genuine issue as to whether Odyssey suffered damages as a result of this conduct.  Thus, the issue is whether BFI's non-performance of the remainder of the WTA was in some way excused or discharged.

While BFI does not dispute that its use of third-party haulers violated the exclusivity and priority provisions of the WTA, it opposes summary judgment for Odyssey on the ground that Odyssey's failure to fully perform under the WTA effectively discharged BFI's obligations and entitled BFI to use third-party haulers in order to mitigate its damages.  According to BFI, Odyssey failed to transport all of the waste in accordance with the requirements of the WTA and failed to maintain the necessary levels of equipment.  These failures, argues BFI, necessitated BFI's use of third-party haulers and prompted giving those haulers equal access to the transfer stations.  Specifically, BFI contends that Odyssey failed to provide 46 trailers as required under § 3.02 of the WTA, causing the build-up of waste at the transfer stations in violation of Pennsylvania Department of Environmental Protection ("PDEP") regulations.

It is an implied condition of each party's remaining duties under a contract that the other party have performed.  Restatement (Second) of Contracts § 237.  At a minimum, the failure of a condition suspends the obligation to perform any corresponding duty unless and until the condition is met.  Id. at § 225(1) ("Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused."); Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd., 739 A.2d 133, 139 (Pa. 1999) ("Where a condition has not been fulfilled, the duty to perform the contract lays dormant and no damages are due for non-

8

performance.") (citation omitted); <u>Oak Ridge Construction Co. v. Tolley</u>, 504 A.2d 1343, 1348 (Pa. Super. 1985) ("If a breach constitutes a material failure of performance, then the non-breaching party is discharged from all liability under the contract.")  A party to a contract is also entitled to suspend its performance if it has demanded, but not received, adequate assurance of performance from the other party when there are reasonable grounds to be concerned about such performance.  Restatement (Second) Contracts § 251(1).

There is sufficient evidence in this record to raise a genuine issue of fact as to whether Odyssey performed its obligation to remove all of the waste from the transfer stations on a daily basis.  If it did not, then BFI's alleged breach that is the basis for Count I of the Complaint may have been excused.  As an initial matter, it is undisputed that there was a significant problem with insufficient removal of waste from the transfer stations, problems that led to citations and fines by PDEP (<u>see</u> Def. Exs. 14, 15, 17, 30), and a declaration by the City of BFI's default under the City Contract as a result of "excessive delays" at both the TRC and 58th Street stations (Def. Ex. 29).  Viewed in the light most favorable to BFI, the evidence in the record thus far suggests that a fact-finder could conclude that Odyssey was responsible for these problems.  For example, in 2004, Odyssey acknowledged in writing that "inconsistent performance" by one of its subcontractors was "leaving the transfer stations under-served."  (Def. Ex. 9, at 2.)  Additionally, in response to a request by Odyssey in July 2003 that BFI stop using third-party haulers, BFI stated that the 58th Street Station required an average of 32 loads per day while Odyssey was averaging only 24 outbound loads per day.  (Pl. Ex. 26, at 2.)  BFI further stated that "[w]ithout the supplemental [third-party] trucking, 58th Street would be shut down . . . [and] TRC would have 2000 tons outside the building right now."  (<u>Id.</u>)  Thus, there is a genuine issue as to

whether Odyssey failed to maintain the necessary equipment as required by the WTA and as to whether this failure and consequent inability to meet BFI's hauling needs constituted a material breach by Odyssey.

In addition to Odyssey's alleged inability provide the requisite equipment, BFI argues that the violation of PDEP regulations also constitutes a breach of the WTA. Specifically, the City Contract required BFI to accept a minimum amount of waste from the City into the transfer stations each day. Thus, BFI had little control over how much trash came into the transfer stations, although BFI remained subject to PDEP regulations that prohibited transfer station operators such as BFI to allow waste "to remain at the transfer facility at the end of the day or for more than 24 hours." See 25 PA Code §279.217(b). Accordingly, BFI depended on Odyssey, as BFI's hauler, to remove waste from the transfer stations as required by the PDEP regulations. BFI contends that Odyssey's failure to do so constitutes an additional breach of the WTA on the part of Odyssey because the WTA required both parties to perform under the contract in compliance with "applicable rules and regulations," including PDEP regulations regarding the storage and timing of transportation of waste.[3] BFI characterizes its use of third-party haulers as an attempt to obtain substitute performance and/or mitigate its damages in the face of Odyssey's

---

[3] See, e.g., 25 Pa. Code §§ 279.201(b); 279.213(b); 279.215(a), 279.216(f), 279.217(b). It is unclear to what extent Odyssey was aware of the PDEP requirements. For example, Carl Singley, Odyssey's principal shareholder, testified that Odyssey "had no knowledge of what was required under the permits." (Singley Dep. 87.) However, William Johnson, Odyssey's Chief Executive Officer, testified that although he had "not seen BFI's permits with their facilities," he was "aware that most facilities, most transfer station facilities, require that trash be moved within a given time frame." (Johnson Dep. 195.) Dennis Jones, a transfer station site manager for Odyssey, also confirmed that he understood that the transfer permits required trash to be removed from the transfer stations within 24 hours and stated that Odyssey management was aware of this requirement. (Dennis Dep. 72.)

allegedly inadequate performance, notices of violation and fines, and default under the City Contract.  This characterization is supported by evidence which, viewed in the light most favorable to BFI, is sufficient for a reasonable jury to find in favor of BFI on these issues.[4]

For its part, Odyssey argues that its own performance problems could not and did not discharge BFI's obligations under the WTA because BFI did not provide Odyssey with notice of any "performance issues" before January 2003, when BFI began using other third-party haulers.  In addition, Odyssey contends that there was no "daily hauling requirement" in the WTA and, therefore, its inability to remove all the waste from the transfer stations was not a breach.  These contentions, however, only serve to illustrate that genuine issues of fact do exist on the question of breach.  For example, there is a genuine factual dispute concerning the hauling requirements under the contract, such as whether the operation of PDEP regulations, with which the parties agreed to comply, effectively creates a daily hauling requirement.  Factual disputes also exist concerning any notice provided by BFI to Odyssey regarding performance problems, the time period when such performance problems began, and whether notice was given before or after BFI began using third-party haulers.[5]  Finally, there is a factual dispute concerning responsibility for the failure to adequately remove waste from the transfer stations.

---

[4] At this stage, therefore, the Court need not reach the question of whether, under Pennsylvania law, BFI, as a result of Odyssey's conduct, was entitled to use third-party haulers and provide them equal access to the transfer stations.  There are sufficient questions of fact as to whether Odyssey breached at all, and whether that breach was material or minor, to deny summary judgment without reaching the question of whether BFI's nonperformance was excused by Odyssey's conduct.

[5] For example, there is evidence, namely a letter from BFI to Odyssey dated July 17, 2002, in the record demonstrating that BFI informed Odyssey of performance problems prior to January 2003.  (See BFI Ex. 15; BFI Reply to TAC MSJ Ex. 18, Bates BFI000220.)

In sum, BFI has presented evidence sufficient to raise a genuine issue as to whether Odyssey's conduct amounted to a breach of the WTA or otherwise discharged BFI's obligations under the exclusivity and priority provisions.  Therefore, the Court will deny Odyssey's Motion.

**B.    Defense Motions for Summary Judgment as to Counts II, III and IV: Tortious Interference with Economic and Business Relationships**

BFI, Ringgold and TAC each have moved for summary judgment as to Odyssey's tortious interference claims (Counts II, III and IV, respectively).  In evaluating these motions, the Court must view the facts in the light most favorable to Odyssey and draw all inferences in its favor. Todish, 206 F.3d at 305.

With respect to tortious interference claims, Pennsylvania has specifically adopted Section 766 of the Restatement (Second) of Torts, which provides that "[o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."  Restatement (Second) of Torts § 766; Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978).  To prevail on a cause of action for tortious interference with an existing or prospective contractual relation, a plaintiff must prove the following elements:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of the defendant's conduct.

Crivelli v. General Motors Corp., 215 F.3d 386, 344 (3d Cir. 2000); see also Strickland v. University of Scranton, 700 A.2d 979, 985 (Pa. Super. 1997).

1.      COUNT II (Odyssey v. BFI)

Odyssey alleges that BFI interfered with "existing contractual relations" between Odyssey and its subcontractors, including Danella and Long Riders Trucking ("Long Riders"), by hiring those subcontractors directly and causing them to cease working for Odyssey.  BFI seeks summary judgment on the ground that there is no evidence of any contract between Odyssey and either subcontractor and, therefore, the record is insufficient to establish a genuine issue of fact as to the first required element for a tortious interference claim.

The Court previously determined that Odyssey's claim against BFI for "tortious interference with business and economic relations" is limited to the alleged interference with *existing* contracts.[6]  Although Pennsylvania recognizes causes of action for interference with both existing and prospective contracts, each is a *distinct* cause of action, Brokerage Concepts, Inc. v.

---

[6] The Court clarified this issue when it denied Odyssey's Motion to Amend the Complaint.  Odyssey proposed amending the Complaint to include averments that Odyssey had "started negotiating" with Danella and Long Riders in 2004 and, therefore, BFI interfered with "Odyssey's prospective business relations."  (Def. Ex. A at ¶¶ 62, 65.)  The Court denied Odyssey's Motion to Amend, in part because the Court viewed the amended complaint as a tardy attempt to "recast[] Odyssey's intentional interference with contractual relations claims as intentional interference with prospective contractual relations," and held that adding "new causes of action" would cause undue delay and prejudice the Defendants.  (Order of August 31, 2006.)  Moreover, in the original Complaint, Odyssey does not allege that *BFI* interfered with Odyssey's "prospective business advantage;" rather, Odyssey specifically avers that "[t]he loss of these existing contractual and business relationships has . . . interfered with Odyssey's prospective business advantage with the customers and the hauling companies."  (Compl. ¶ 34.)  Thus, as BFI correctly points out, paragraph 34 is Odyssey's assertion of *damages*, rather than an assertion of tortious interference with prospective business relations.

U.S. Healthcare, Inc., 140 F.3d 494, 529-30 (3d Cir. 1998),[7] and Odyssey failed to plead

sufficient facts to state a claim for tortious interference with *prospective* contractual relations.[8]

The fundamental issue, therefore, is whether Odyssey had contracts with Danella or Long

Riders with which BFI interfered.  For a contract to be formed, there must be a manifestation of

an intent by each party to be bound.  University Graphics, Inc. v. Pro-Image Corp., et al., 913 F.

Supp. 338, 342 (M.D. Pa. 1996) (citing Philmar Mid-Atlantic v. York Street Assoc. II, 566 A.2d

1253, 1255 (Pa. Super. 1989)).  The intent to later formalize an agreement in writing does not

prevent the formation of a contract where the parties have settled on the terms of the agreement.

Id. at 342 (quoting Philmar-Atlantic, 566 A.2d at 1255).  However, "[a]bsent a manifestation of

an intent to be bound, . . . negotiations concerning the terms of a possible future contract do not

result in an enforceable agreement."  Id.  (quoting Philmar-Atlantic, 566 A.2d at 1255).

---

[7] Odyssey cites the Court's Memorandum and Order of November 17, 2005, which denied TAC's motion to dismiss, and which refers to "tortious interference with business and economic relations" interchangeably with "tortious interference with actual and prospective business relationships."  The Court, however, denied the motion to dismiss on the ground that Odyssey had pleaded sufficient facts to state a claim against TAC for alleged interference with an *existing* contract and did not reach the issue of whether Odyssey had stated a claim for interference with any *prospective* contracts.  At least with respect to BFI, the Court made clear that Odyssey had only stated a claim for interference with *existing* contractual relations, and denied Odyssey's late attempt to broaden its allegations to include the separate and distinct tort of interference with *prospective* contractual relations, claims which Odyssey should have known about from the start of this litigation and which did not first suggest itself from discovery.

[8] Federal pleading standards do not allow a party "to raise new claims at the summary judgment stage. . . . Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of the facts set forth in the complaint."  Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004); see also Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment") (citation omitted); Speziale v. Bethlehem Area Sch. Dist., 266 F. Supp. 2d 366, 371 n.3 (E.D. Pa. 2003) ("Plaintiff's counsel cannot reasonably expect to amend the complaint after the close of discovery merely by raising new arguments in the [summary judgment] responsive papers").

Odyssey concedes that it never executed a contract with either Danella or Long Riders, the two entities named in the Complaint and in the testimony of Messrs. Johnson, Singley and Nicholas Pisacano, the human resources coordinator at Odyssey.  (See Compl. ¶¶ 29-34; Pisacano Dep., Def. Ex. 3 at 306-10; Johnson Dep., Def. Ex. 2 at 249-51; Singley Dep., Def. Ex. 1 at 143.)  Although Count II is not expressly limited to Danella and Long Riders, Mr. Johnson and Mr. Pisacano, when asked under oath, did not identify any others, (Johnson Dep., Def. Ex. 2 at 363-64; Pisacano Dep., Def. Ex. 3 at 324-25), and Odyssey did not produce any signed contracts in response to discovery requesting any such contracts (Def. Mem. 15).[9]

Similarly, Odyssey has not demonstrated that the parties reached an agreement on the material terms, whether or not memorialized.  (See Piscacano Dep., Def. Ex. 3 at 306-10; Johnson Dep., Def. Ex. 2 at 29-251.)  In addition, there is nothing in the record indicating that Long Riders or Danella performed any work for, or received any payment from, Odyssey.  Mr. Johnson described Odyssey's relationship with Danella and Long Riders as follows:

> Q: Am I correctly interpreting that language to say that – that you and – sorry, Odyssey and Long Riders never, in fact, entered into a contract?
> A: We negotiated.  We discussed rates, and I provided them at our mutual – upon our mutual agreement, a draft of the language, our standard language, and a contract for them to review.
> . . .
> Q: Did Danella ever sign a contract with Odyssey?
> A: No.
> Q: Tell me about how far negotiations between Odyssey and Danella progressed.
> A: We discussed volumes.  We discussed equipment.  We discussed rates.  And again, when we left the conversation, they wanted, and we agreed,

---

[9] Mr. Johnson's deposition testimony transcript states that Odyssey signed a contract with Long Riders, but both Odyssey and BFI agree that this was a transcription error, and Mr. Johnson has submitted an errata sheet confirming the error.

that I would provide them with a draft agreement that [sic] could review the language, et cetera.

(Johnson Dep. 248-51.)  Likewise, in a June 8, 2004 letter to BFI, Mr. Johnson characterized Odyssey's interactions with Long Riders and Danella as "discussions" and "negotiations," but did not state that an agreement had been reached.  (See Def. Response to Odyssey Motion, Ex. 9.)  Mr. Pisacano also testified that he did not think Danella or Long Riders "really responded" to Odyssey's proposed pricing in the draft contracts.  (Pisacano Dep. 309.[10])  Thus, based on the evidence currently in the record, no reasonable jury could find that Odyssey had entered into an agreement or contract with either Danella or Long Riders by the time of BFI's alleged interference.[11]

Instead, Odyssey argues that, even without an executed contract, its existing "commercial relationships" with Danella and Long Riders suffice to establish the requisite predicate contractual relationship for a tortious interference claim.  Apparently hoping to finesse the difference between "contractual" relationships and "commercial" relationships, Odyssey has produced evidence sufficient to raise a genuine issue as to whether such "commercial relationships" existed, such as unsigned draft contracts and testimony regarding contract

_____

[10] On this point, the Pisacano testimony was as follows:

> Q:  Do you know how Long Riders or Danella responded to the proposed pricing in the draft contracts?
> A: I know that they were able to work directly with BFI, so I don't think they really responded or they did not complete a contract.

(Pisacano Dep. 309.)

[11] Odyssey has not asserted to the Court that an oral agreement between Odyssey and either Danella or Long Riders was reached.

16

negotiations.  Presumably, the "commercial relationships" that Odyssey suggests were the

relationships between the entities by which they were aware of each other, aware of their

respective business interests and willing to at least consider doing business with each other.

However, while such evidence may be sufficient to defeat summary judgment on a claim for

interference with *prospective* contractual relationships, it does not forestall summary judgment

on a claim for interference with *existing* contractual relationships.  See Daniel Adams Associates,

Inc. v. Rimbach Publishing, Inc., 519 A.2d 997, 1000 (Pa. Super. 1987) (Essential to the right of

recovery under a tortious interference with contract claim is the existence of a contractual

relationship between the plaintiff and a third person other than the defendant.); Al Hamilton

Contracting Co. v. Cowder, 644 A.2d 188, 191 (Pa. Super. 1994) ("A critical element of the tort

is a current contractual relationship between the plaintiff and another.") (citation omitted).

Thus, because Odyssey has failed to raise a genuine issue of fact as to the existence of any

existing contractual agreement with any subcontractors,[12] the Court will grant summary judgment

in favor of BFI on Count II.

### 2.      COUNT III (Odyssey v. Samuel Ringgold)

Odyssey alleges that Mr. Ringgold interfered with the WTA between BFI and Odyssey

both by recruiting TAC to haul waste for BFI, and by participating in efforts by BFI to obtain

permission from the MBEC to terminate the WTA, to certify TAC as a minority-owned

company, and to replace Odyssey with TAC.  Mr. Ringgold moves for summary judgment on the

grounds that (1) he was an agent of BFI acting within the scope of his responsibilities and,

---

[12] Because Odyssey has failed to raise a genuine issue as to the first required element of a
tortious interference claim, the Court will not address the remaining three elements.

therefore, cannot interfere with the principal's contracts, and (2) the actions taken by Mr. Ringgold did not tortiously interfere with the WTA.

As set forth above, one of the essential elements of tortious interference is the existence of a contract between the plaintiff and "a 'third person' *other than the defendant*." Daniel Adams, 519 A.2d at 1000 (citing Glenn v. Point Park College, 272 A.2d 895, 898 (Pa. 1971)) (emphasis added); see also Maier v. Maretti, 671 A.2d 701, 707 (Pa. Super. 1995) ("Essential to recovery on the theory of tortious intereference with contract is the existence of three parties . . . . As a result there must be a contractual relationship between the plaintiff and a party other than the defendant.")

The acts of an agent within the scope of his agency are imputed to and binding on the corporation. Daniel Adams, 519 A.2d at 1000. Accordingly, an agent of a corporation has immunity from a claim of tortious interference with a contract between his principal, i.e., the corporation, and a third party, CGB Occupational Therapy, Inc. v. RHA Health Serv., Inc., 357 F.3d 375, 385 (3d Cir. 2004). This is because "holding an agent liable would be like holding the principal itself liable for the tort of interfering with its own contract, instead of holding the principal liable for breach of contract." Id.; see also Daniel Adams, 519 A.2d at 1002 (concluding that "where, as here, a plaintiff has entered into a contract with a corporation, and that contract is terminated by a corporate agent who has acted within the scope of his or her authority, the corporation and its agent are considered one so that there is no third party against whom a claim for contractual interference will lie").

Thus, the issue is whether BFI may be considered a "third person," separate and distinct from Mr. Ringgold, that is, whether Mr. Ringgold, while he was a consultant, was acting as BFI's

agent or, even if so, whether he acted outside the scope of his agency.  Under Pennsylvania law, a principal-agent relationship is created by the manifestation of the principal that the agent shall act for the principal, the agent's acceptance of the undertaking, and the understanding of the parties that the principal is to be in control of the undertaking.  Basile v. H & R Block, Inc., 761 A.2d 1115, 1120 (Pa. 2000).

Here, Mr. Ringgold provided paid consulting services to BFI pursuant to a written agreement (the "Consulting Agreement") from September 1, 1999 until August 2004, at which time he was hired as a full-time employee by Allied, of which BFI is a wholly-owned subsidiary. Thus, at all relevant times, Mr. Ringgold was authorized to act on behalf of BFI, duties which Mr. Ringgold accepted by signing the Consulting Agreement and, later, the Employment Agreement.  Therefore, the record establishes that Mr. Ringgold acted as BFI's agent in his capacity a business consultant since at least 1999.  See Restatement (Second) of Agency § 228 ("[C]onduct is within the scope of employment if, but only if: (a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits [and] (c) it is actuated, at least in part, by a purpose to serve the master . . . .").

The inquiry, however, does not end there.  Agents may be liable where they act in their personal capacity or outside the scope of their authority, American Trade Partners v. Int'l Importing Enters., 757 F. Supp. 545, 555 (E.D. Pa. 1991).  An intentional interference claim also may be asserted against a corporate agent where that agent, acting in his personal capacity or outside the scope of his authority, acted with malice towards the plaintiff or against the corporation's best interests.  Kiely v. University of Pittsburgh Medical Ctr., No. 98-1536, 2000 U.S. Dist. LEXIS 3156, at *33-34 (E.D. Pa. Jan. 20, 2000).  Under Pennsylvania law, however,

19

"the mere existence of a personal motivation is insufficient to relieve the employer from liability where the conduct also benefitted him and was within the scope of employment generally." Brumfield v. Sanders, 232 F.3d 376, 380-381 (3d Cir. 2000) (citations omitted).  The burden of establishing that an agent acted outside the scope of the agent's engagement falls on the party advancing that argument, in this case, Odyssey.  Tucker v. Merek & Co., Inc., No. 02-2421, 2002 WL 31689256, at *2 (E.D. Pa. Dec. 2, 2002).

Odyssey does not dispute that as a paid consultant to BFI, Mr. Ringgold's primary responsibilities involved the management of BFI's relationship with the City of Philadelphia under the City Contract and responsibility for compliance with the Minority Participation Program.  (See Pl's Response to Statement of Undisputed Facts ¶¶ 15-18.)  Assuring compliance with the Minority Participation Program required Mr. Ringgold to solicit on behalf of BFI minority- and women-owned firms.  Odyssey also does not dispute that, as of August 2004, BFI explicitly directed Mr. Ringgold to help BFI "[s]ecure the City of Philadelphia Solid Waste Disposal contract beginning July 1, 2005."  (Def. Ex. 16 at 4; Def. Ex. 14 at 43.)  In addition, in late 2003 or early 2004, BFI instructed Mr. Ringgold to investigate other potential minority haulers for the Philadelphia market.  (Def. Ex. 14, Ringgold Dep. 84-85.)

To try to carry its burden of proving that Mr. Ringgold acted outside the scope of his authority, Odyssey alleges that Mr. Ringgold, in order to receive a bonus tied to bringing TAC into the Philadelphia market, concealed from BFI that the WTA covered *all* waste (as opposed to just City waste) and thereby deceived BFI into contracting with TAC.[13]  Odyssey argues that

---

[13] Odyssey did not raise this theory of liability in the Complaint.  While Odyssey alleged in the Complaint that Mr. Ringgold *acted in concert and conspired with* BFI, Odyssey now argues that Mr. Ringgold *acted at odds with* BFI (and thus in his own interest and outside the

"[s]uch an intentional nondisclosure by Ringgold, combined with his actions as to recruiting

TAC, were clearly against BFI's best interests as it subjected BFI to potential liability under the

WTA," and were in Mr. Ringgold's own interests because he allegedly would receive a bonus for

securing TAC.  Therefore, argues Odyssey, Mr. Ringgold was acting in his personal capacity and

outside the scope of his authority.

The record, however, belies Odyssey's assertions and supports summary judgment in

favor of Mr. Ringgold.  First, by the terms of his Employment Contract, Mr. Ringgold would

receive a bonus only for securing a new contract with the City, not for bringing TAC into the

Philadelphia market.  Moreover, even if the evidence raised a legitimate question as to whether

Mr. Ringgold was to receive additional money for recruiting TAC (see Hee Dep., Pl. Ex. 60), Mr.

Ringgold was nonetheless acting under the direction, and, hence, in the interest of BFI.  Second,

there is no evidence in the record indicating that Mr. Ringgold deliberately withheld any

information from BFI.  And finally, nothing in the record indicates that BFI entered into its

contract with TAC under any misapprehension about its obligations under the WTA.[14]

Thus, Odyssey has failed to raise a genuine issue of fact as to whether Mr. Ringgold was

BFI's agent, or as to whether he acted outside the scope his authority and in his personal capacity

during the relevant time period.  Therefore, Mr. Ringgold is immune from liability for tortious

---

scope of his authority).  Although a plaintiff "cannot . . . change theories after a motion for
summary judgment has been filed," Andrews v. Abbott Lab., No. 00-901, 2002 U.S. Dist. LEXIS
6832, at *12 n.2 (E.D. Pa. Apr. 18, 2002), the Court need not address the question here because,
even under its new theory, Odyssey fails to defeat Mr. Ringgold's motion for summary judgment.

[14] Odyssey agrees that any confusion about the terms of the WTA was resolved in June
2004, and BFI did not enter into the contract with TAC until, at the earliest, February 2005.

interference with the WTA, and the Court will grant him summary judgment as to Count III.[15]

### 3.  COUNT IV (Odyssey v. TAC)

Odyssey alleges that TAC intentionally interfered with the actual and prospective business relationships of Odyssey by "(a) conspiring with Ringgold and BFI to develop a strategy to violate Odyssey's agreement with BFI; (b) encouraging employees of Odyssey to leave its employ and began [sic] working directly for TAC; (c) taking actions to divert revenue that Odyssey was legally entitled to under the Agreement; and (d) conspiring with Defendant Ringgold to exploit Odyssey's prospective business opportunities." (Compl. ¶ 41.)  TAC moves for summary judgment on the ground that the record fails to raise a genuine issue of fact as to each of the elements of tortious interference.

As previously stated, a plaintiff must prove the following elements to prevail on a claim for tortious interference:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of the defendant's conduct.

Crivelli, 215 F.3d at 344.  To avoid summary judgment, Odyssey must affirmatively come forward with "specific facts" in the form of admissible evidence demonstrating that a genuine issue exists for the fact-finder.  Fed. R. Civ. P. 56; Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387

---

[15] Mr. Ringgold also argues, in the alternative, that even if he was not BFI's agent or acting within the scope of his authority, his conduct did not interfere with the WTA because he acted with the intention of replacing Odyssey, not during the term of the WTA, but rather after its expiration in 2005, for the *next* contract with the City.  The Court need not reach this argument because the record supports the conclusion that, with respect to TAC and the MBEC, Mr. Ringgold was acting on behalf of BFI and in compliance with BFI's explicit directions.

n.13 (3d Cir. 1999); Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (stating that the nonmovant cannot rely on unsupported assertions, conclusory allegations or mere suspicions). Where, as here, the plaintiff would bear the burden of proof at trial, summary judgment in favor of the defendant is appropriate when the plaintiff cannot establish the existence of an element essential to its case. Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805-06 (1999).

Since Odyssey has failed to demonstrate a genuine issue of fact as to the two final elements – that is, whether TAC acted in the absence of privilege or justification and whether TAC's conduct caused any harm to Odyssey – the Court need not address the first two elements and will focus the analysis on the third and fourth elements.

### a.    Absence of Privilege or Justification

Odyssey must establish the absence of privilege or justification on TAC's part to prevail on a claim for tortious interference with contractual relations. Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471 (Pa. 1979). In the context of tortious interference claims, "[t]he presence of a privilege is not an affirmative defense, rather, the absence of such a privilege is an element of the cause of action which must be pleaded and proven by the plaintiff." Bahleda v. Hankison Corp., 323 A.2d 121, 122-23 (Pa. Super. 1974).

To determine whether an actor's conduct was improper or wrong, Pennsylvania courts embrace Section 767 of the Restatement (Second) Torts, which states that courts should look to the following factors: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the party with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual

interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties. <u>Windsor Secs., Inc. v. Hartford Life Ins. Co.</u>, 986 F.2d 655, 663 (3d Cir. 1993); <u>Adler</u>, 393 A.2d at 1184.  The determination as to whether a party's behavior was improper such that it constituted tortious interference is based on the circumstances of each case and "requires inquiry into the mental and moral character of the defendant's conduct." <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1382 (3d Cir 1992).  Proper conduct in this context is "socially acceptable conduct that comports with the rules of the game which society has adopted." <u>Id.</u> at 1381.

Odyssey contends that TAC's actions do not comply with recognized standards of business ethics and custom – that is, fair play and the "rules of the game." <u>See</u> <u>Kachmar v. SunGard Data Sys., Inc.</u>, 109 F.3d 173, 185 (3d Cir. 1997); <u>Franklin Music Co. v. Am. Broadcasting Cos., Inc.</u>, 616 F.2d 528, 544 (3d Cir. 1979).  Urging the Court to consider the factual scenario as a whole, <u>see Ruffing v. 84 Lumber Co.</u>, 600 A.2d 545, 599 (Pa. Super. 1991), Odyssey asserts that the record at least raises a question of fact as to whether TAC improperly "lobbied" for BFI's business when it knew that BFI was then party to a contract with Odyssey.[16]  In addition, Odyssey argues that TAC

---

[16] Citing <u>Adler, Barish, Daniels, Levin & Creskoff v. Epstein</u>, 393 A.2d 1175 (1978), Odyssey asserts that Pennsylvania courts have held this type of conduct to be improper.  In <u>Adler</u>, the court held that the conduct of former law firm associates in actively soliciting the law firm's clients was improper and thus the law firm could maintain its action against the former associates for intentional interference with existing contracts. <u>Id.</u> at 1185.  The <u>Adler</u> court, however, relied heavily on the fact that the associates' conduct violated the then extant Pennsylvania Code of Professional Conduct and breached the duty an agent owes the principal. <u>Id.</u> (right to pursue own business interests is not absolute since "unless otherwise agreed, after the termination of the agency, the agent . . . has a duty to the principal not to take advantage of a still subsisting confidential relation created during the prior agency relation) (<u>quoting</u> Restatement (Second) of Agency § 396(d)).  The fact that the clients' contracts with the law firm were term contracts, as opposed to at-will contracts, had no bearing on the court's finding.  Odyssey cites no other cases for the proposition that solicitation of a party to a contract is improper for purposes of a tortious

was "complicit in BFI's bad business behavior" because TAC accepted payments from BFI before the termination of the WTA, and that this complicity was improper.

The evidence in the record, however, merely demonstrates the existence of negotiations between BFI and TAC and, when viewed in the light most favorable to Odyssey, the inference of possible solicitation on the part of TAC with respect to BFI. The affirmative actions taken by TAC are as follows: (1) expression of interest in the Philadelphia market at a meeting with BFI in the spring of 2004; (2) correspondence with BFI throughout 2004; (3) discussions and negotiations in November and December of 2004, by which point TAC knew of the WTA and which indicate TAC's expressions of its ability and willingness to begin work in early 2005 (see Pl. Exs. JJ, KK).

TAC's conduct cannot be said to be objectively improper. It is entirely "fair" and, indeed, commonplace, for competitors to compete for business contracts, and such solicitation may take place prior to the termination of current contracts in anticipation of new arrangements. There is nothing in the record that displays an explicit effort on the part of TAC to interfere with the WTA or to provide an incentive for BFI to breach the WTA. Rather, the record demonstrates that TAC entered into negotiations with BFI and expressed a willingness to meet BFI's Philadelphia hauling needs. This alone cannot be said to violate standards of fair play and the "rules of the game." A contrary holding here risks saddling third parties with the responsibility of policing the current contracts of their prospective business partners and exercising a kind of *in loco parentis* conscience for those potential partners for the protection of the very party sought to be replaced. Not only would such a duty be unrealistic, the Court gravely doubts it could ever be workable, much less successful. See P.V.C. Realty ex rel. Zamias v. Weiss, No. 1995-639, 2000 WL 33406981, at *14

interference claim.

25

(Pa. Com. Pl. Dec. 19, 2000) ("The issue in each case is whether the interference is improper or not under the circumstances; whether upon a consideration of the relative significance of the factor involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation.").  Finally, TAC's conduct lacks proximity to Odyssey's alleged loss because the record establishes BFI's dissatisfaction with Odyssey's performance predating and independent of its negotiations with TAC and BFI's hiring of other contractors in addition to TAC.

In sum, Odyssey's position substantially depends on unwarranted inferences from its own suspicions to suggest that TAC's conduct was any way wrongful.  These unsupported allegations by Odyssey are insufficient to raise a genuine issue of fact with respect to the absence of privilege or justification.[17]  Thus, because TAC's conduct, viewed objectively, falls within the "area of socially acceptable conduct which the law regards as privileged," and because neither the parties nor the Court have discovered any case holding analogous conduct to be improper or otherwise

_____

[17] The Pennsylvania Supreme Court has noted that "[t]he absence of privilege or justification in [tortious interference] is closely related to the element of intent. . . . What is or is not privileged conduct in a given situation is not susceptible of precise definition."  Adler, Barish, Daniels, Levin & Creskoff, 393 A.2d at 1183-84.  The amorphous "rules of the game" standard, otherwise defined as the "area of socially acceptable conduct which the law regards as privileged," marks the boundary between privileged conduct and liability.  See id. at 1184 ("'[W]here, as in most cases, the defendant acts at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff, a line must be drawn and the interests evaluated.  This process results in according or denying a privilege which, in turn, determines liability.'") (quoting Harper & James, The Law of Torts § 6.11).  Odyssey has succeeded only in pointing to evidence which could be interpreted as an intent to interfere, which is closely related but nonetheless distinct from the question of whether or not TAC's conduct was privileged or justified.  Thus, while Odyssey may have marshalled sufficient evidence to create an issue as to intent, it has not done so as to the separate, required element of lack of privilege or justification.

26

actionable,[18] simply stated, Odyssey has failed to raise a genuine question of fact as to whether TAC acted without privilege or justification.

### b.   Damages

To prevail on a tortious interference claim, Odyssey must prove that actual damage occurred *as a result* of TAC's interference with the WTA.  See Crivelli, 215 F.3d at 394.  Liability for tortious interference with prospective or existing contractual relations includes "the pecuniary loss of the benefits of the contract or the prospective relation; consequential losses for which the interference is a legal cause; and emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference."  Pawlowski v. Smorto, 588 A.2d 36, 40 (Pa. Super. 1991).

TAC contends that even if Odyssey could establish the requisite improper interference by TAC, Odyssey cannot establish that any damages to it resulted from such interference because (1) Odyssey did not lose its contract with BFI as a result of any action on the part of TAC, and (2) BFI recruited TAC to replace Odyssey.  Odyssey responds that, at a minimum, TAC is liable to Odyssey for the payments TAC received from BFI between March 2005 and June 30, 2005, during which time the WTA should have remained in effect.

---

[18] In Air Terminal Services, Inc. v. Lehigh-Northhampton Airport Authority, No. 96-2314, 1996 WL 460059 (E.D. Pa. Aug. 1, 1996), the court denied a motion to dismiss on a tortious interference claim where the defendant, "while knowing of the pre-existing contract between Plaintiff and the Airport, contracted with the Airport to establish a competing food business on the Airport premises, thereby preventing the Airport from fulfilling its alleged responsibility under the exclusivity provision of the contract."  Id. at *3.  Here, however, at the summary judgment stage, there is insufficient evidence in the record to establish (1) that TAC contracted with BFI prior to the (albeit premature) termination of the WTA, (2) that TAC's actions in any way caused BFI to breach or prevented BFI from fulfilling its obligations, or (3) that TAC intended to replace Odyssey under BFI's existing City Contract (as opposed to the prospective 2005 contract).

Odyssey's argument is flawed, however, because it begs the question of whether TAC's conduct *caused* BFI to use third-party haulers while still under contract with Odyssey. While Odyssey may have suffered damages due to BFI's use of third-party haulers, there is nothing in the record demonstrating that Odyssey's alleged losses occurred as a result of TAC's actions. On the contrary, it is undisputed that BFI sought and obtained permission from the City to terminate the contract with Odyssey, that BFI affirmatively made the initial contact with TAC *and other third-party haulers*,[19] and, finally, that TAC initially declined BFI's offers. As Ron Adolph, TAC's Chief Executive Officer, explained, "We negotiated with BFI to do work for them under the new contract in July of 2005. They mentioned they were having some problems and needed some help earlier . . . ." (Adolph Dep. 61.)

Thus, although a contract existed between BFI and Odyssey during the relevant time period, this record would not support a finding by a rational trier of fact in favor of Odyssey as to the third and fourth required elements of a claim for tortious interference. There is nothing in the record that supports the notion that TAC acted improperly, or that Odyssey's loss of the contract and revenue in any way resulted from TAC's actions. Therefore, the Court will grant summary judgment in favor of TAC on Count IV.

**C.    BFI's and Mr. Ringgold's Motion to Exclude Odyssey Valuation Testimony and Any Testimony by Plaintiff's Expert With Respect Thereto**

Odyssey has claimed two categories of damages: lost profits and lost business value. In accordance with Federal Rule of Civil Procedure 26(a)(2), Odyssey tenders the report of George L.

---

[19] Indeed, Odyssey does not dispute that BFI recruited and hired other third-party haulers, including Danella, Long Riders, Seagull Environmental and Jesse Baro, beginning in 2002, (Def. Statement of Undisputed Facts at ¶¶ 6-7; Pl. Response to Undisputed Facts at ¶¶ 6-7), or that BFI did not have any contact with TAC until the summer of 2003 (Pl. Mem. at 8).

Miller (the "Odyssey Expert Report").  Mr. Miller proposes that Odyssey is entitled to *both* lost

profits (by his calculation, $2,310,000) *and* lost business value (by his calculation, $2,000,000).

Mr. Miller calculated the profits Odyssey allegedly lost as a result of BFI's "failure to allow

Odyssey to be the exclusive hauler of 100% of the Solid Waste from the Transfer Stations" for the

period from January 1, 2003 to June 30, 2005, and Odyssey's "fair market value" as of December

31, 2003.  (Odyssey Expert Report, Def. Ex. 1 at 5, 7.)

BFI moves to exclude the Odyssey Export Report and Mr. Miller's testimony on the

grounds that Mr. Miller's valuation is methodologically unsound because (1) it values Odyssey as

of the wrong date; (2) as a result, it double-counts most of the lost profit damages; and (3) it is

based on assumptions that, even if arguably reasonable as of the valuation date actually used, are

demonstrably unreasonable as of the proper valuation date.  BFI contends that, at a minimum, Mr.

Miller's lost profits and lost business value figures should be presented as *alternative* measures of

damages because the calculation of lost business value incorporates the concept of loss of value

due to lost profits.

BFI fits these objections into the Federal Rule of Evidence 702 / <u>Daubert</u> framework on the

grounds that, to be reliable, an expert's opinion must be compatible with applicable law, i.e., an

expert cannot propose damages that are not legally recoverable.  <u>JMJ Enter., Inc. v. Via Veneto</u>

<u>Italian Ice, Inc.</u>, No. 97-652, 1998 U.S. Dist. LEXIS 5098, at *22-23 (E.D. Pa. Apr. 15, 1998),

<u>aff'd</u>, 178 F.3d 1279 (3d Cir. 1999) (holding that an expert's opinion was methodologically

unreliable because, among other things, it made the "significant error" of aggregating damage

measurements that were, in fact, alternatives).  BFI asserts that lost profits and lost business value

may be cumulatively recovered *when measured for separate periods*, but may not be cumulatively

recovered when measured, as Mr. Miller proposes to do for Odyssey, for the *same* period because a plaintiff may not recover twice for the same injury.  See Judge Tech. Servs., Inc. v. Clancy, 813 A.2d 879, 887 (Pa. Super. 2002) ("An injured party cannot recover twice for the same injury, based on the theory that double recovery results in unjust enrichment.").

Pursuant to F.R.E. Rule 104, district courts are charged with determining "the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence."  Fed. R. Evid. 104(a).  This "gatekeeping" function of the district court extends to the evidence and testimony of proposed expert witnesses.  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).  Rule 702, which governs the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Civ. P. 702.  Thus, Rule 702, as interpreted in Daubert, provides "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit."  Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000).  The party offering the expert testimony has the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence.  Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999). Here, at this juncture BFI disputes only the reliability of Mr. Miller's opinion and report.

The determination of "reliability" may be guided by various factors, including a non-

exclusive list set forth in Daubert itself.[20]  Ultimately, however, "the inquiry as to whether a particular scientific technique or method is reliable is a flexible one."  In re Paoli Railroad Yard Litigation, 35 F.3d 717, 748 (3d Cir. 1994) (citing Daubert, 509 U.S. at 594; United States v. Downing, 753 F.2d 1224, 1238-39 (3d Cir. 1985)).  An expert's opinions must be based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation," and the expert must have "good grounds" for his or her belief.  Id. at 742.  However, an expert's opinion may still be based on "good grounds" where a court thinks that there are better grounds for an alternative conclusion.  Main Street Mortgage, Inc. v. Main Street Bancorp., Inc., 158 F. Supp. 2d 510, 514 (E.D. Pa. 2001).  Moreover, the fact that an expert's methodology has some flaws that, had they been corrected, would have caused a different result, does not necessarily make the expert unreliable.  Id.  Courts may not exclude expert testimony if the sole basis for such exclusion is a flaw in the expert's investigative process which renders the expert's conclusions incorrect.  Id.

Although BFI couches its arguments in terms of reliability, BFI and Mr. Ringgold concede that their Motion to Exclude is more specifically a challenge to the appropriateness of Mr. Miller's method and the accuracy of the dates, rates and figures he used in applying the method, rather than the reliability of the method itself.  Therefore, the Court will deny the Motion without prejudice to BFI and Mr. Ringgold to later raise the issue as a motion *in limine* or as otherwise appropriate with

---

[20] Important factors to consider in assessing reliability include (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.  In re Paoli R.R. Yard PCB Litigation, 35 F.3d at 742 (citing Daubert, 509 U.S. at 590-94; Downing, 753 F.2d at 1238-39).

respect to an evaluation of the correct measure of damages in this case.

**CONCLUSION**

For the foregoing reasons, the Court will grant summary judgment to the Defendants as to Counts II, III and IV, and deny summary judgment as requested by Odyssey as to Count I, and deny the Motion to Exclude.  An Order consistent with this Memorandum follows.


BY THE COURT:


S/Gene E.K. Pratter
_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ODYSSEY WASTE SERVICES, LLC,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **BFI WASTE SYSTEMS OF NORTH** | : | |
| **AMERICA, INC., TAC TRANSPORT,** | : | |
| **INC., and SAMUEL RINGGOLD,** | : | |
| **Defendants** | : | **NO. 05-cv-1929** |

## <u>ORDER</u>

AND NOW, this 27th day of February, 2007, upon consideration of:

• The Motion for Summary Judgment of Odyssey Waste Services, LLC (Docket No. 46), the Responses of BFI Waste Systems, Inc. and Samuel Ringgold thereto (Docket No.53), Odyssey's Reply (Docket No. 61) and the Surreply of BFI and Mr. Ringgold (Docket No. 63);

• The Motion for Summary Judgment of BFI and Mr. Ringgold (Docket No. 40), the Response of Odyssey thereto (Docket No. 50), the Reply of BFI and Mr. Ringgold (Docket No. 59) and Odyssey's Surreply (Docket No. 62);

• The Motion for Summary Judgment of TAC Transport, Inc. (Docket No. 39), the Response of Odyssey thereto (Docket No. 42), TAC's Reply (Docket No. 48), the Reply of BFI and Mr. Ringgold (Docket No. 49) and Odyssey's Surreply (Docket No. 52); and

• The Motion to Exclude Odyssey Valuation Opinions and Any Testimony of Plaintiff's Expert with Respect Thereto (Docket Nos. 44 and 47), Odyssey's

Response thereto (Docket No. 57) and the Reply of BFI and Mr. Ringgold (Docket

No. 60);

it is hereby ORDERED that:

1.  The Motion for Summary Judgment of Odyssey as to Count I (Docket No. 46) is

DENIED;

2.  The Motion for Summary Judgment of BFI and Mr. Ringgold as to Counts II and III

(Docket No. 40) is GRANTED;

3.  The Motion for Summary Judgment of TAC as to Count IV (Docket No. 39) is

GRANTED; and

4.  The Motion to Exclude Odyssey Valuation Opinions (Docket Nos. 44 and 47) is

DENIED without prejudice.

It is further ORDERED that a status conference to discuss a final pretrial schedule will be

held with the Honorable Gene E.K. Pratter Thursday, March 8, 2007 at 10:00 a.m. in

Chambers, Room 7614, United States Courthouse.  A continuance of the conference will be

permitted only if no knowledgeable counsel for each party is available to attend.


BY THE COURT:


S/Gene E.K. Pratter

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

GENE E.K. PRATTER

UNITED STATES DISTRICT JUDGE

2